Johnson, J.,
concurring. The plaintiff in error brought suit in the court of common pleas of Hamilton county against the Ohio Traction Company seeking to enjoin the company from charging and collecting a fare of more than five cents from the north boundary line of the village to the Cincinnati Zoological Garden, or intermediate points.
In its petition the plaintiff alleged that in March, 1900, the village passed an ordinance granting to the Millcreek Valley Street Bailway Company the right to construct, operate and maintain a single or double street railway in the village, commencing at the south corporation line thereof, in the highway known as the Hamilton, Springfield and Carthage turnpike, thence to the north corporation line of the village.
*327 The petition alleged that the franchise was granted for a term of twenty-five years from its date- and constitutes a contract between the village and the Ohio Traction Company, which is alleged to be. the successor in interest of the Millereek 'Valley Street Railway Company, and that the defendant is now engaged in operating and maintaining the said electric street railway system under the franchise as aforesaid; that Section 5, paragraph 2 of the franchise reads, viz: “Between said north line of the Village of Wyoming and the Zoological Gardens, Cincinnati, cash fares shall be five cents for adults and three cents for children under twelve years of age or two for five cents.”
The petition further alleged that the mayor of the village was on March 22, 1920, served with a notice signed by the Ohio Traction Company and the Cincinnati Traction Company that from March 23, 1920, acting on the peremptory order of the director of street railroads of Cincinnati, the said rates of fare would be seven cents for adults and three and three-fourths cents for children under ten years of age, until further notice; and that the companies have posted notices in the cars of the defendant company operating from the village to the southern terminus of the company in the city of Cincinnati.
Plaintiff avers that if the defendant carries out the terms of the notice it will violate the franchise contracts and the rights of plaintiff under the same, and therefore prays for the injunction as stated.
The city of Cincinnati was not a party to the petition originally filed, but was granted leave by the court to be made a party and to file an answer. In its answer it admitted the terms of the Wyoming *328 franchise and the posting and service of the notice above referred to, and averred that in pursuance of the act of April 22, 1896, known as the Rogers ’ law, the board of administration of the city, on August 13, 1896, by resolution, granted an extension of time to the Cincinnati Street Railway Company for the various lines of roads, routes and franchises owned' by it and brought under its control and ownership by uniting said lines, etc., with the lines of roads, routes and franchises of the Mt. Adams and Eden Park Inclined Railway and Mt. Auburn Cable Railway under the provisions of said Rogers act, by virtue of which the Cincinnati Street Railway Company, and its successors and assigns, was granted a franchise for the period of fifty years from and after April 22, 1896, to maintain and operate its railways in the city of Cincinnati, which grant was accepted by said railway and became a valid and binding contract; that in 1901 the company leased its system in the city of Cincinnati to the Cincinnati Traction Company, which has ever since and is now operating it.
As a further defense the city averred that in said Rogers law it was provided that at the end of twenty years from the passage of said act, and every fifteen years thereafter, the municipal corporation should have power to fix rates .of fare to be charged by the company, and all other terms and conditions on which such railroad was operated; that such terms should be fixed by the board of administration, or the legislative body of the corporation, and that pursuant thereto in the grant of 1896 it was provided as one • of the terms that the rates of fare should be subject to revision and change at the end of twenty *329 years from the 22d of April, 1896, and every fifteen years thereafter, which fare so to be fixed should be equitable according to the then cost of carrying pas- • sengers; that in pursuance of said provision, at the expiration of said twenty-year period, to-wit, August 23,1918, the council of the city passed ordinance Number 253-1918, revising the terms and conditions of the franchises; that said revision, in November, 1918, was attacked by a taxpayer’s suit against the city in the superior court of Cincinnati, in which it was alleged that the revision ordinance was unconstitutional and void; but that such suit was decided adversely to the taxpayer’s contention and said judgment is still in force.
It was further pleaded that as one of the considerations of the revision ordinance the traction company agreed that during the continuance of the lease from the Cincinnati & Hamilton Traction Company (successor to the Millcreek Valley Street Railroad Company) to the Ohio Traction Company, or during any renewal thereof, the Cincinnati Traction Company would cause the railway of the Millcreek Valley line, so far as within the city limits, to be operated, “so long as and when it may lawfully be operated,” as a part of the transportation system of the Cincinnati Traction Company and the Cincinnati Street Railway Company, as subject to all the conditions of the revision ordinance; that it was- further provided that the rates of fare on the lines of the Cincinnati Traction Company should be uniform in amount, based upon the cost of service plan set forth in the ordinance; and that it was provided by paragraph 20 that “passengers shall not be carried by the companies on or over any of the routes, or new. *330 additional, changed, or extended routes within the city, or from points without the city, at any less rate of fare than the rate of fare then in force and effect for carrying the same class of passengers to or from points within the City of Cincinnati. ’ ’
The city further alleged that because of the Rogers law, the extension ordinance of April, 1896, and the revision thereof in 1918, the Ohio Traction Company is without authority to charge and collect on the Millcreek Valley line, through any portion of the city of Cincinnati, a fare different in amount from that charged under the uniform service at cost rates provided for in the revision ordinance, but that nevertheless passengers have been charged other lower rate, and other passengers have been discriminated against; that pursuant to Article XVIII of the Constitution of Ohio the city adopted a home-rule charter, and is vested with all governmental power regulating the use of its streets, and the rates of fare that shall be charged for passengers transported on street railways operated in said city; that it was not competent in law, by ordinance, or otherwise, for the village to regulate or attempt to regulate rates of fare upon the streets of the city, and that the franchise granted by the village to the Millcreek Valley Street Railway Company referred to in plaintiff’s petition was at all times subject to the exercise by the city of its governmental power, as aforesaid.
In its answer the Ohio Traction Company says that it was not competent by ordinance, contract, or otherwise, for the village to regulate or attempt to regulate fares on the streets of the city of Cincinnati; that the grant by the village was subject at all times to the exercise by the city of its power to regulate *331 and control the operation of street cars on its streets, and that because of this exercise by the city the Ohio Traction Company is unable longer to carry out the franchise with the village in the limits of Cincinnati.
In its reply the village denied that the city was either a necessary or a proper party defendant, admitted the passage of the resolution by the city in 1896, referred to in the answer, and the passage of the ordinance revising the same in 1918, and admitted the action brought by the taxpayer referred to, but denied that the question decided in that case was in any way material or relevant to any question arising between the village and the Ohio Traction Company, or that the judgment in any way affected the rights of the parties.
It averred that if the revision ordinance, or the charter of the city, adopting home rule, could be construed to give the city the right to annul any of the grants and franchise of the village, the same would be in violation of Section 10, Article I of the Constitution of the United States, forbidding any state to pass laws impairing the obligation of contracts, would be in violation of Section 1 of the 14th Amendment to the Constitution of the United States, and a violation of Section 3, Article XVIII, and Section 28, Article II, of the Constitution of Ohio.
In its reply the village also set out a history of the Millcreek Valley line in detail, including the grant to the owners of that line of franchises over the highways occupied by the line of the company, and averred that the city, having annexed the territory occupied by said highways and by said Millcreek Valley line, now the Ohio Traction Company’s line, *332 took the annexed territory subject to the rights 'of all parties therein; and in reply to- the answer of the Ohio Traction Company the village admitted the passage of the revision ordinance, referred to, its acceptance by the street railway companies and the Cincinnati Traction Company, and denied that the passage of the revision ordinance was an exercise by the city of any power to revise rates of fare; it set forth certain paragraphs of the revision ordinance, denied that the line of the Ohio Traction Company, formerly the Millcreek Valley Company, was subject to the terms and conditions of the revision ordinance, and denied that the rates of. fare were fixed on the cost of service plan, but that if so fixed they would have no application to fares to be charged from the village of Wyoming to the Zoological Gfarden, or vice versa, under the franchise of the city to the Millcreek Valley Company, and, further, that under Sections 5 and 14 of the revision ordinance the city recognized it had no authority to change such rate of fare.
It further averred that whatever powers the city may hace obtained under the home-rule charter, it did not obtain the power to change rates of fare made by valid contracts between the companies and other municipal authorities during the term of the contract,'and denied that the Ohio- Traction Company is no longer able to perform its contract.
On the trial of the cause in the court of common pleas the court found the issues in favor of the defendants and dismissed the plaintiff’s petition.
The plaintiff appealed the cause to the court-of appeals of Hamilton county, which likewise found the issues in favor of the defendants- and entered judgment against the plaintiff. This proceeding is *333 brought to reverse the judgment of the court of ap-’ peals.
The controversy concerns the rate of fare authorized to be charged over the line operated by the Ohio Traction Company from points between the north corporation line of the village of Wyoming and the Zoological Garden in the city of Cincinnati.
It is conceded that the Ohio Traction Company, defendant, is the successor in title to the Millcreek Valley Street Railroad Company. The Ohio Company became the owner by successive grants and contracts from different companies which had formerly held the right to operate street railways over the line now operated by the Ohio Company. The different grants and contracts are set forth in detail in the record.
In March, 1920, the mayor of the village was served with a notice by the Ohio Traction Company and the Cincinnati Traction Company that on and after March 25th, by order of the director of street railroads of the city of Cincinnati, the fare between the north line of the village and the Zoological Garden in the city, would be seven cents for adults and three and three-quarters cents for children under the age of ten years, which was an increase over the fare provided for in the franchise granted by the village in March, 1900, to the Millcreek Valley Company.
The record discloses that commencing in January, 1889, grants were made to street railway companies and interurban companies to operate on certain portions of the Carthage pike within the county of Hamilton, and from the intersection of the pike with the north line of the city. Much of the territory in- *334 eluded in these grants has since been annexed to the city of Cincinnati.
The Millcreek Valley Company, predecessor of the .Ohio Traction Company, defendant, became the owner of the franchises. In March, 1900, the board of county commissioners of Hamilton county granted to the Millcreek Valley Company the power to lay, maintain and use its tracks for the purpose of operating cars by electricity, or power other than steam, on and over the Hamilton, Springfield and Carthage pike from the southern terminus in the village of Carthage to the northern boundary line in Hamilton county for a period of twenty-five years, and in the same month the plaintiff village granted to the Mill-creek Valley Company the franchise to construct, operate and maintain an electric railway in the village, commencing at the south corporation line thereof, and in the said turnpike, for the period of twenty-five years; among the terms and conditions was that the charge to passengers on the line from Fountain Square in the city of Cincinnati to and from any point in the said village of Wyoming should not exceed ten cents cash fare, and from the entrance of the Zoological Garden in the city of Cincinnati to and from any point in the village should not exceed five cents cash fare. This grant was accepted by the company.
The defendants in error contend that the police power of the city to regulate rates of fare on street railways operated within the limits of the city, which the council exercised by the passage of the revision ordinance in 1918, was conferred upon it in 1896 by the express provisions of the Rogers law, authorizing the city at the end of twenty years to revise rates *335 of fare and all other terms and conditions of the franchise, as well as by virtue of the adoption by the people of a home-rule charter in 1917.
The defendants in error also contend that the rates provided by the franchise granted by the village over any portion of the territory of the city were valid and binding on the defendant company only so long as the council of the city had not regulated the rates of fare on such street railway lines within such territorial limits of the city; and that on the passage by the council of the city of the ordinance of revision in 1918, revising the fifty-year franchise and requiring the Millcreek ’Valley lines to be operated as part of such street railway system and requiring passengers on all lines, including the Millcreek Valley lines, to be charged a uniform rate of fare based upon the cost of service plan embodied in the revision ordinance, the provisions of the franchise of the village in so far as they sought to regulate the fare over the streets of the city became inoperative and of no legal force and effect and impossible of performance by the defendant company within the city.
. It will, therefore, be seen that the decisive questions in the case are, first, what was the legal effect of the extension under the Rogers law in 1896 to fifty years of the franchise granted by the city to the Cincinnati street railway companies, and, second, what is the legal effect of the revision ordinance passed by the city in 1918? Was the latter a regulatory ordinance passed in the exercise of the police power or was it a step authorized by the Rogers law preliminary to making a new contract as to rates, etc., with the company?
*336 It must be noted that the grant made by the city in 1896 under the Rogers law was made to the Cincinnati Street Railway Company and related to the lines controlled and operated by it; and that it did Slot relate in any way to the Millcreek Valley Company or to the lines operated by it, or its successor in title.
The language of the resolution granting the extension is “to The Cincinnati Street Railway Company for the various lines of road, routes and franchise owned by it, and brought under its control and ownership.”
The Rogers law, Section 2505d> Revised Statutes, included the provision that it “shall be competent in all such cases for the board of administration in any city of the first grade of the first class, and for the council or other legislative body of any other municipal corporation to extend the- time of each of said grants or franchises for such periods as together with the unexpired term of such existing grant or franchises shall not exceed the period of fifty years from and after the passage of this act; provided, the company so acquiring control and ownership of said roads will agree to such changes and modifications in the existing terms and conditions of said grants or franchises.” (Then are set forth provisions for changes, such as motive power, transfer and rates of fare, etc.)
It will be observed that the Rogers law simply granted to the legislative body of municipalities the power to deal with certain specific companies in the manner stated, and enacted that the company had the option to accept or not the provisions made by the city legislative body; that is to say, it gave to *337 the board of administration or the legislative body of the city the authority to enter into a new contract with the specified companies and in the new contract to extend the term of the franchise to 50 years from the passage of the law.
There is a wide distinction between the power of the state and its municipalities to regulate rates by compulsory provisions in the exercise of the police power and the right of a city to make franchise contracts with a public service company. The power to regulate rates is the exercise of the legislative authority of the state or city. The public utility company having devoted its property to the public use must yield to public regulation in the interest of the general welfare, and that power to regulate must be reasonably exercised and must not be confiscatory. A contract is a different matter. It implies parties capable of contracting and a meeting of their minds concerning the thing about which they contract and as to the considerations of the contract. If a municipality is. a party it must have been vested with full authority to make such a contract.
This court has repeatedly declared these principles. City of Cincinnati v. Pub. Util. Corn., 98 Ohio St., 320, and Newark Natural Gas & Fuel Co. v. City of Newark, 92 Ohio St., 393.
They are again declared in Southern Iowa Electric Co. v. City of Chariton, Iowa, 255 U. S., 539, recently decided by the supreme court of the United States, in the following language, at page 541: *338 reasonable rates to be paid public utility corporations for the services by them rendered, that power does not include the right to fix rates which are so low as to be confiscatory of the property of such corporations, Reagan v. Farmers’ Loan & Trust Co., 154 U. S., 362; Smyth v. Ames, 169 U. S., 466; San Diego Land & Town Co. v. Jasper, 189 U. S., 439, 442; Knoxville v. Knoxville Water Co., 212 U. S., 1, 17; Wilcox v. Consolidated Gas Co., 212 U. S., 19, 41; Minnesota Rate Cases, 230 U. S., 352, 434; Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U. S., 655; Des Moines Gas Co. v. Des Moines, 238 U. S., 153; Denver v. Denver Union Water Co., 246 U. S., 178, 194; and (b) that where, however, the public service corporations and the governmental agencies dealing with them have power to contract as to rates, and exert that power by fixing by contract rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and therefore the question of whether such rates are confiscatory becomes immaterial. Freeport Water Co. v. Freeport, 180 U. S., 587, 593; Detroit v. Detroit Citizens’ Street Ry. Co., 184 U. S., 368; Knoxville Water Co. v. Knoxville, 189 U. S., 434, 437; Cleveland v. Cleveland City Ry. Co., 194 U. S., 517; Home Telephone Co. v. Los Angeles, 211 U. S., 265, 273; Minneapolis v. Minneapolis Street Ry. Co., 215 U. S., 417; Columbus Railway, Power & Light Co. v. Columbus, 249 U. S., 399.”
*337 “Two propositions are indisputable: (a) That although the governmental agencies having authority to deal with the subject may fix and enforce
*338 Now, under the extension granted in pursuance of the Rogers law, the legislation enacted by the Board of Administration constituted the necessary steps preliminary to and part of the making of a *339 binding contract between the parties, the city and the particular company. It was not the enactment of legislation of uniform operation throughout the city and affecting every person and company similarly situated. It was not a regulatory ordinance passed in the exercise of the police power, which this company and all other companies would be compelled to comply with. In this case it was necessary for the company to consent — to accept. And when the company accepted, that act created a contract between the parties to it. East Ohio Gas Co. v. City of Akron, 81 Ohio St., 33; City of Columbus v. Columbus Gas Co., 76 Ohio St., 309; Interurban Ry. & Terminal Co. v. City of Cincinnati, 93 Ohio St., 108, and City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517.
The same observation must be made as to the revision ordinance passed in August, 1918. Section 2505d of the Rogers law also' contained the following: “And provided further that the municipal corporation in which such street railroad is situated shall have the power at the end of twenty years from the passage of this act and every fifteen years thereafter to fix the rates of fare, ear license fees, percentage tax on gross earnings, transfers and all other terms and conditions on which such railroad is operated in said city. The said terms shall be fixed by the board of administration if there be such a board, and if there be none then by the common council or legislative body of the municipal corporation. * * * Should the parties not agree as to whether said terms are equitable, the same may be submitted to the adjudication of a court of competent jurisdiction in a suit brought by the *340 company to enjoin the municipal corporations from enforcing the terms so fixed.”
The power granted by this section is by express terms of the law to deal with the particular company with which it had contracted at the outset, or its successor. It is not given plenary power to regulate rates. The provision is that at the end of twenty years the city may adopt a new resolution fixing the new rates and new terms and conditions and that these new rates, terms and conditions must be agreed to by. the company or determined in the manner stated.
In this instance the city and the company agreed upon the terms of the revision ordinance of 1918 and when they did so they made a new contract binding upon themselves. We know of no rule under which we could hold that it was binding upon any company or person not a party to the contract or in privity with it.
It is conceded that the Ohio Traction Company, and its predecessors, have acquired their franchise rights in a regular and legal way, unless, as contended, these rights must now yield on account of what has been done under the Rogers law, namely the making of the contract of revision in 1918 above referred to. But the Rogers law does not purport to confer upon the city the right to set aside or disregard contracts other than those referred to in the terms of the Rogers law itself, but even if it did so tiit would be powerless to set aside subsisting valid franchise contracts which had not been made pursuant to the Rogers law or subject to any of its provisions.
When the city, of Cincinnati extended its boundaries and annexed territory, as shown in the rec *341 ord, which included the line of the Ohio Traction Company, or other railroads, it took that territory subject to all valid contractual rights then in existence, and those contractual rights are protected by the provisions of the Constitutions of the United States and Ohio. Section 10, Article I of the United States Constitution, and Section 28, Article II of the Ohio Constitution.
A franchise is included within the broader term “grant” and the same general principles are applicable to it in reference to the constitutional inhibition as to the impairment of the obligation of contracts. City of Cincinnati v. Pub. Util. Comm., 98 Ohio St., 320; 6 Ruling Case Law, 340; 12 Corpus Juris, 1009; City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517, 534.
The case of L. & N. Rd. Co. v. Mottley, 219 U. S., 467, is cited in support of the defendant’s contention. In that case the railroad company had settled a claim for personal injuries with Mottley and his wife and had agreed to grant them free passage over the railroad during their lives. The company performed its agreement: until congress passed a statute' forbidding railroad companies from carrying certain persons on their trains on passes. The federal supreme court held that the power of congress to regulate commerce among the states and foreign nations is complete and unrestricted, except by limitations in the constitution itself, and extends to rendering impossible the enforcement by suit of contracts between carriers and shippers, though valid when made.
■ In that ease congress had passed a general provision which prevented the granting of any of the privileges stated, and it was of uniform application. *342 Under the Constitution of the United States congress is not prohibited from passing such legislation. The provision in Section 10, Article I of the Constitution of the United States, is that no state shall pass a law which shall impair the obligations of a contract, and the Constitution of Ohio, Section 28, Article II, prohibits the legislature of Ohio from passing such a statute. So that even if this was a regulatory ordinance fixing compulsory rates, it could not be effective to set aside existing contracts in Ohio. But this is not a regulatory ordinance passed in the exercise of the police power to fix rates applicable within the territory under the jurisdiction of the legislative body. The revising ordinance was passed by the municipality as one necessary step to the making of a contract between the parties. The municipality can only act by ordinance and resolution, and when it acted the company accepted and thus made the contract. The Mottley case has no application.
There has been for a long period a consistent policy followed in Ohio in the construction of street railroads The plan has been to make grants to street railroads and to interurban railroads by municipal councils and by boards of county commissioners. The terms of the franchise granting the privilege to construct, maintain and operate the railway have covered the matter of fares and all other essential provisions pursuant to specific statutory provisions and safeguards. “When complied with a contract has been made by the parties.
A different policy has been followed with reference to other public utilities. For instance, by Section 3982, General Code, authority has been con *343 ferred upon municipal corporations to regulate the price of gas by compulsory regulatory ordinances, and by Section 3983, General Code, if the council fixes the price for a period of ten years and the company accepts, the acceptance constitutes a contract. City of Cincinnati v. Pub. Util. Comm., 98 Ohio St., 320, and cases there cited.
Before the passage of the Rogers law the legislature passed Section 2505c, Revised Statutes, which is now Sections 9130 et scq., General Code. Those sections provide that an interurban road which desires to enter a city may enter into a contract with the street railroad company operating within that city for the use of its tracks, and this contract, if confirmed by two-thirds of the stockholders of each company, gives to the interurban company full authority without franchise from the city 'to operate its cars on the tracks of the street railroad company in such municipal corporation or corporations.
It is conceded that the Ohio Traction Company holds such a contract with the Cincinnati Traction Company. The rights of the Ohio Traction Company under that contract have not been in any wise nullified by the contract of revision made by the city and the Cincinnati Traction Company in 1918, because the Ohio Traction Company was not a party to that revisory contract; and, even if it had been, it could not by contracting with third parties relieve itself of its obligations to the village of Wyoming under its contract with it. Substantially the same stockholders own and hold the capital stock of both the Cincinnati Traction Company and the Ohio Traction Company. But they are separate corporate entities and the separate contracts of each *344 are binding on it wholly without reference to the other.
Moreover, in 1914, the city passed an ordinance to evict the Cincinnati & Hamilton Traction Company, lessor of the Ohio Traction Company, from its route in the city limits. The company brought an injunction proceeding in the United States court for the southern district of Ohio. In that case an injunction was granted, apparently on the theory that the grant involved was, perpetual. The case was taken to the supreme court of the United States, where the decree of the court below was modified. (City of Cincinnati v. Cincinnati & Hamilton Traction Co., 245 U. S., 446.) The court, at page 455, says: “Accepting, and for all purposes of the cause relying upon representations and admissions, of counsel for the city as above detailed, we conclude that the decree below should be modified so as to exclude from it any finding concerning validity of franchises involved or rights claimed by appellees and to limit the affirmative relief granted to an injunction restraining the city (1) from taking any steps to enforce the ordinance (except institution of necessary court proceedings) prior to final adjudication of controversies involved, and (2) from ever setting up a claim that appellees’ continued operation of cars over streets now used pending such final adjudication does or will amount to an acceptance of the ordinance by appellees, or in any way prejudice their rights.”
It is obvious that the present suit is not the “institution of necessary court proceedings” referred to by the federal supreme court. The plaintiff village in this case is entitled, because of its contrac *345 tual rights against the Ohio Traction Company, the lessee of the Cincinnati and Hamilton Company, to insist on the enforcement of the decree. That would of itself be decisive of this case.
It is also contended that the adoption in 1917 of a home-rule charter by the city, under Article XVIII of the Constitution as amended in September, 1912, conferred plenary power on the city to regulate street railway rates at the time of the passage of the revision ordinance in August, 1918.
As to this, it must be noted that as already shown the revision ordinance passed in 1918 was in pursuance of the authority given under the Rogers law in 1896, and when accepted by the company it constituted a revision of the contract made in 1896. There was no attempt made by the city to enact regulatory legislation either under the Rogers law or under the powers it acquired by the charter adopted under the home-rule amendment.
Conceding that it acquired thereby all powers of local self-government, subject to the limitations stated in the amendment, it still was not vested with power to set aside contractual or property rights acquired prior to its adoption.
In Gunn v. Barry, 15 Wall. (82 U. S.), 610, it was held that a state can no more impair an existing contract by a constitutional provision than by a legislative act. Both are within the prohibitions of the national constitution.
The Millcreek Valley Company, predecessor of the Ohio Traction Company, not having been contracted with or dealt with by the city in 1896, or at any time, under the Rogers law, there was nothing upon which the provision fov -fAvision at the end *346 of twenty years could operate so far as that company is concerned.
It is urged that the village had and has no power to enact a regulation fixing rates of fare outside the municipality, and this may be conceded, but it had the right to contract with reference to the subject with a public utility company operating lawfully a street railway in such territory, in the absence of statutory or other restrictions preventing it from so contracting. Section 9113, General Code (Sec. 3443, R. S.); Interurban Ry. & Terminal Co. v. City of Cincinnati, 93 Ohio St., 108, 121.
The contract between the village and the Mill-creek Valley Company, made in March, 1900, was a valid agreement and will expire in March, 1925, and the successor of the Millcreek Valley Company is now exercising all of the rights granted thereunder, and is bound by its terms. That contract has not been annulled by the revision ordinance passed by the city in 1918, and the city has no right to invoke a judicial decree concerning same except ia the manner stated in City of Cincinnati v. Cincinnati & Hamilton Traction Co., 245 U. S., 446, supra.
Hough, J., concurs in this opinion.